**Livingston S. HIERN, et al.**

v.

**A. Lester SARPY, et al.**

**Civ. A. No. 94–835.**

United States District Court, E.D. Louisiana.

May 3, 1995.

---

1. The Court notes that none of the counts alleging violations of Louisiana law specifically aver fraud.

William D. Treeby, George C. Freeman, III, Alex J. Peragine, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, LA, for Livingston S. Hiern, Housemaster Corp.

Jack M. Alltmont, Michael A. Berenson, Sessions & Fishman, New Orleans, LA, for A. Lester Sarpy, Canal Mortg. & Finance Co., Inc., Acme Mortg. Co. Inc., Union Homes Inc.

## ORDER AND REASONS

JONES, District Judge.

Pending before the Court is defendants' motion for appointment of a special master, or, alternatively, for appointment of an expert. Having reviewed the memoranda of the parties, the record and the applicable law, the Court DENIES the motion.

### Background

This litigation arises from a long-term business relationship between plaintiff Livingston S. Hiern and defendant A. Lester Sarpy. Hiern and Housemaster Corp. filed this lawsuit in March 1994 alleging violations of RICO, legal malpractice, breach of fiduciary duty, securities violations and other state law claims in regard to transactions between Hiern and Sarpy and their related businesses. (R.Doc. 1.) Allegedly the illegal transactions occurred between the mid–1970s and the early 1990s. During the 1960s and 1970s, according to the defendants' initial memorandum in support of this motion (R.Doc. 45), Housemaster, which was solely owned by Hiern, and another entity named Northern Homes, Inc., purchased tracts of land in St. Tammany Parish. *Id.* at 1–2. Sarpy or one of his entities provided the financing, with Housemaster or Northern Homes granting a collateral mortgage on the real estate with the debt guaranteed by Hiern individually. *Id.* at 2. The loans from the Sarpy entity to the Hiern entity "typically carried an interest rate of 24 percent to 30 percent per annum." *Id.*

Defendants contend that not only did Sarpy cause his entities to provide the financing but also Sarpy caused his entities to provide "special advances" to or on behalf of Hiern personally or one of his entities for real estate taxes, living expenses or payments for Hiern's debts. *Id.*

According to plaintiffs' initial memorandum in opposition (R.Doc. 64, p. 4), Housemaster, of which Hiern was sole owner and stockholder, sold numerous tracts of land in St. Tammany Parish from 1975 to 1981, and in a typical transaction Housemaster would finance part of this purchase. The purchaser would give Housemaster a mortgage note, usually with a 15–year payment, and House-

master would sell the notes to Sarpy's mortgage companies at a discount of about 50 percent. *Id.* Plaintiffs allege that the proceeds from the sale of these mortgage notes were never actually received by Hiern, who endorsed the checks back to Sarpy for application against existing loan balances. *Id.*

Defendants dispute this, arguing that payment of the purchase price varied from case to case depending on Hiern's need for cash. (Defendants' initial memorandum in support, R.Doc. 45, p. 3.) In some cases Hiern received a check; in some cases the Sarpy entity issued a check for less than the purchase price and made an entry in its books to give credit to a Heirn entity against the "special advances," against interest, principal or a combination of these. *Id.* The defendants agree that in some cases Hiern endorsed the check back to the Sarpy entity. *Id.*

The dispute revolves around whether these loans from defendants to plaintiffs were ever paid off, whether defendants ever gave plaintiffs a proper accounting, and whether subsequent transactions after the loans were allegedly paid off inured to the benefit of defendants instead of plaintiffs. Defendants also allege that various compromise agreements between the parties occurred due to the difficulty of keeping track of the balances due. (Defendants' initial memorandum in support, R.Doc. 45, p. 3.)

Both parties contend that since the lawsuit was filed they have worked to exchange documents to try to narrow the issues and the amounts allegedly due from one party to the other. Needless to say, they still disagree.

Defendants move for an appointment of a special master pursuant to Fed.R.Civ.P. 53(b), or, alternatively, for appointment of an expert pursuant to Fed.R.Evid. 706.[1] Defendants desire the appointment of a special master to unravel the alleged mystery of the complex real estate and loan transactions. In their amended motion defendants deleted their request that the special master determine if fraud occurred, conceding that this is a jury question. (R.Doc. 73.) However, defendants contend that, because each side's

expert will put his own gloss on the issues at trial, a special master is needed to evaluate the documents and testimony of each party and present an independent opinion. Otherwise, the jury will be hopelessly confused at trial.

Alternatively, defendants seek appointment of an expert pursuant to Fed.R.Evid. 706. Defendants argue that an objective expert would be able to examine the accounting, real estate and loan documents at issue and provide findings and opinions that would better aid the jury in reaching a conclusion because each side's hired experts are only interested in helping his own clients.

Plaintiffs counter that, under Rule 53(b), appointment of a special master is appropriate in only the most exceptional of cases involving intrinsically complex issues. The commercial real estate transactions at issue are not so complicated or technical that the jury can not comprehend these issues without a special master. In fact, the number of disputed transactions has actually been narrowed from "many hundreds to about forty." (Plaintiffs' initial memorandum in opposition, R.Doc. 64, p. 7. *See also* Plaintiffs' supplemental memorandum, R.Doc. 77, p. 2–3.)

In regard to the appointment of an expert, plaintiffs argue that this should occur only in the most compelling of circumstances, which has not been shown here. According to plaintiffs, defendants have failed to show exactly how each of the experts disagree such that a jury will not comprehend the information.

Further, plaintiffs contend that they cannot afford to pay for either a special master or another expert.

### Law and Application

#### A. Appointment of Special Master

■■■ According to Rule 53(b), as a general proposition the reference to a special master is the exception rather than the rule. In a jury trial the reference should be made only when the issues are "complicated." *Id.* "The minimum required is a demonstration

---

**1.** Defendants initially sought appointment of a special master (R.Doc. 45) and then amended

their motion to seek, alternatively, a court-appointed expert. (R.Doc. 73.)

that over and beyond a mere numerical quantitative analysis, the case is intrinsically complex." *In re Tom Watkins*, 271 F.2d 771, 774 (5th Cir.1959). Citing *Watkins*, the Supreme Court has stated: "Even this limited inroad upon the right to trial by jury 'should seldom be made, and if at all only when unusual circumstances exist.'" *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, n. 18, 82 S.Ct. 894, 900, n. 18, 8 L.Ed.2d 44 (1962), quoting *La Buy v. Howes Leather Co.*, 352 U.S. 249, 258, 77 S.Ct. 309, 314, 1 L.Ed.2d 290 (1957).

In *Watkins* the issue on a writ of mandamus was whether a reference to a special master in a jury trial was proper. *Watkins*, 271 F.2d at 772. The plaintiff, Wesson Oil, had sued the defendant, Watkins, on two promissory notes and an open account. *Watkins*, 271 F.2d at 773. The defendant counterclaimed for improper conversion of insurance proceeds as a result of a fire at a cotton gin. *Id.* One of the promissory note claims involved a "detailed examination" of a great number of Wesson Oil's books, but there were also absent records and other matters causing "confusion and uncertainty" factually as to this claim. *Id.* at 774. This was the only claim involving accounting, and the court of appeals found that "[b]asically the case turns on the credibility of Watkins and [an agent of Wesson Oil] with possible factual-legal questions on the extent to which action, representations, etc. of [the agent] may bind Wesson Oil." *Id.* at 775. The court found that these issues were "traditionally for a judge or jury as a factfinder." *Id.* at 775. Therefore, because the record was inadequate to support a reference to a special master, the court granted the writ of mandamus and vacated the reference. *Id. See also Otis Engineering Corp. v. Trade & Dev. Corp.*, C.A. No. 92–1574, 1994 WL 321122 (E.D.La. filed June 27, 1994) (Berrigan, J.) (rejecting a request for appointment of spe-

cial master simply because the issues were complex; resolution of discrepancies between experts is the job of factfinder).[2]

 In the present case, although there seem to be numerous financial transactions and records at issue, the record does not show an inordinate number to be in dispute. Indeed, according to the unrebutted assertion of plaintiffs in their memoranda, only about 40 of these transactions are in contention. Like *Watkins*, this case is not one where the issues are so complicated as to require reference to a special master. Instead, the issues are for a jury as factfinder to decide. Beyond a mere quantitative analysis, there has been no showing that the case is so intrinsically complex as to require a special master's aid.

 Moreover, the fact that the experts disagree is not sufficient reason to require intervention of a special master. As Judge Berrigan stated in *Otis Engineering*, resolution of expert disagreement is within the province of the factfinder. The use of masters should aid, not displace, the jury as factfinder. *La Buy*, 352 U.S. at 256, 77 S.Ct. at 313. *See also Watkins*, 271 F.2d at 775 (reference to special master "nullifies the right to an effective trial before a constitutional court").

 Additionally, although defendants concede that appointment of a special master is improper in fraud actions,[3] the appointment of a special master to determine nonfraud issues rather than all issues runs the risk of confusing the jury more than helping it.

Therefore, the Court finds that defendants have failed to show that this case is so complicated that reference to a special master is necessary.[4]

---

**2.** This order is attached as Exh. A to plaintiffs' initial memorandum in opposition, R.Doc. 64.

**3.** *See Bradshaw v. Thompson*, 454 F.2d 75, 80 (6th Cir.1972) (actions for fraud are "particularly inappropriate for reference to a special master" except in extraordinary or exceptional instances).

**4.** As to plaintiffs' contention that reference to a special master would cause financial hardship because of the costs associated with the special

master's fees, the Court notes that at least one court has refused to appoint a special master when financial burdens would be imposed on the plaintiff, *Fraver v. Studebaker*, 11 F.R.D. 94 (W.D.Pa.1950). The Fifth Circuit has stated that "the policy underlying Rule 53 is the alleviation of unnecessary burdens to litigants and the cornerstone of the rule is the avoidance of delay, costs, and a factfinder other than a judge." *Cruz v. Hauck*, 515 F.2d 322, 330 (5th Cir.1975).

## B. Appointment of Expert

Rule 706(a) of the Federal Rules of Evidence provides, in pertinent part:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed. . . .

■ Such an appointment by the court is within its discretion, but "the mere fact that the parties' retained experts have expressed divergent opinions does not necessarily warrant that the Court appoint an expert to aid in resolving the conflict." *Mallard Bay Drilling, Inc. v. Bessard*, 145 F.R.D. 405, 406 (W.D.La.1993). *See also Applegate v. Dobrovir, Oakes & Gebhardt*, 628 F.Supp. 378, 383 (D.D.C.1985) (appointment of expert appropriate only in "compelling" circumstances).

In this case, while the experts apparently disagree heartily on the outcome of the case (one claims that the plaintiffs owe defendant $1.6 million and the other expert claims that defendants owe plaintiff $1.9 million),[5] plaintiffs contend that this disagreement arises largely from the treatment of pre–1978 transactions, specifically interest on those transactions. (Plaintiffs' memorandum in opposition to alternative motion for appointment of expert, R.Doc. 74, pp. 6–7.) Additionally, plaintiffs maintain that both side's experts use the same accounting methodologies and agree on the treatment of many transactions. *Id.* at 6. Where they disagree, according to plaintiffs, is on the treatment of key transactions, the amount of damages and the existence of fraud. *Id.*

Notwithstanding the cause of the disagreement, plaintiffs correctly argue that defendants have not shown specifically how the appointment of an expert will help the jury to comprehend the evidence to be presented at trial. Absent such a showing, the court's appointment of an expert would just add an additional witness, who may testify in favor of one side or the other. Whether or not the jury is informed that the third expert was appointed by the court,[6] a danger exists that the appointed expert would side with either of the other experts, giving one side an inappropriate numerical advantage. As the Magistrate Judge stated in *Mallard Bay Drilling*, "it is axiomatic that the weight of evidence is not to be determined by the number of witnesses that testify." 145 F.R.D. at 406.

Further, the parties are free at trial to examine and cross-examine the experts, testing their theories and reasoning, such that a jury will be able to decide the issues.

■ Defendants quote extensively from the *Manual for Complex Litigation* on the necessity for appointment of an expert, but they fail to quote the following sentence: "Even in complex litigation, [appointment of an expert] is the exception and not the rule." *Manual for Complex Litigation*, § 21.5. Indeed, as the *Manual* states, the objective of the appointment of an expert is "a more understandable trial, not a shorter one." *Id.* at § 21.51. Defendants have not specifically shown how appointment of an expert would make this trial more understandable.

■ In a supplemental memorandum (R.Doc. 85) the defendants also argue that the proposed amended complaint by plaintiffs and the recent discovery deposition of defendant Sarpy are evidence of the necessity of a court-appointed expert. The Court is not persuaded by defendants' contentions. In addition to the fact that a hearing is pending before the Magistrate Judge on whether plaintiffs can file an amended complaint, defendants' argument as to the amended complaint relates to the volume of transactions. However, volume does not automatically translate to complexity. Defendants' contention as to the Sarpy deposition is that an independent expert is needed to clarify the propriety of Sarpy's calculations for a jury. However, defendants have made no showing as to why their own expert can not make this

Therefore, in this case, where each side apparently has experts, and where the parties have worked diligently on narrowing the disputed issues, the Court also finds there is no reason to impose additional costs on either party.

5. Defendants' reply memorandum to motion to appoint special master, R.Doc. 66, pp. 4–5.

6. It is within the court's discretion whether or not to tell the jury that the court appointed the expert. Fed.R.Evid. 706(c).

clarification or why they cannot test the theory of plaintiffs' expert on this issue.

Therefore, the Court finds that defendants have not made a sufficient showing as to the need for a court-appointed expert.[7]

Accordingly,

IT IS ORDERED that the motion by defendants for appointment of a special master or, alternatively, an expert is DENIED.

---

7. Defendants also state that they would be willing to pay the cost of a court-appointed expert. Fed.R.Evid. 706(b) specifically provides that the court may apportion the costs of an appointed expert among the parties and at such time as the court directs. However, because the Court declines to appoint an expert for the reasons stated, the Court does not reach the issue of who should pay for a court-appointed expert.