**Felix UITHOVEN, Plaintiff,**

v.

**Michael P.W. STONE, Secretary of the Army, Defendant.**

**No. 1:93CV106–S–D.**

United States District Court, N.D. Mississippi, Eastern Division.

Nov. 21, 1995.

Jim Waide, Tupelo, MS, for Plaintiff.

Frank W. Hunger, Assistant Attorney General, Alfred E. Moreton, III, United States Attorney, William M. Dye, Jr., Assistant United States Attorney, Vincent M. Garvey, Honorable Andrew C. Phelan, Attorneys, Federal Programs Branch, Civil Division, Dept. of Justice, Washington, D.C. (Cynthia Pickett, Attorney Adviser, Real Estate Division, U.S. Corps of Engineers, of counsel), for Defendant.

## OPINION

SENTER, Chief Judge.

In this case, plaintiff seeks a writ of mandamus to compel defendant to reconvey certain condemned property to him. Presently before the court is defendant's motion to dismiss or, alternatively, for summary judgment. Because matters outside the pleadings were considered by the court, the motion will be treated as one arising under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b).

## BACKGROUND

In 1946, the United States Congress authorized the construction of the Tennessee–Tombigbee Waterway Project (Tenn–Tom). Pub.L. No. 525. The Tenn–Tom was "designed as a navigational project for two-way barge traffic to connect the north-flowing Tennessee River with the south-flowing Tombigbee River so as to provide a continuous waterway from the Tennessee, upper Mississippi and Ohio Valleys to the tidewater Port of Mobile on the Gulf of Mexico." *Environmental Defense Fund, Inc. v. Alexander,* 467 F.Supp. 885, 890 (N.D.Miss.1979), *aff'd,* 614 F.2d 474 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). In 1976, Congress appropriated funds for the Columbus Lock and Dam located in Mississippi on the Tombigbee River. Pub.L. No. 94–355. Nine years later, the entire project was open and available for commercial navigation.

As part of the Columbus portion of the project, the United States Corps of Engineers sought condemnation of numerous tracts of land in Clay County, Mississippi, including approximately 162 acres owned by the plaintiff, Felix Uithoven. *See United States v. 162.20 Acres of Land,* Nos. EC78–26–S & EC78–27–S (N.D.Miss. Feb. 14, 1978). By order dated March 4, 1982, the court fixed just compensation for the Uitho-

ven property at $124,000.00 and officially vested title to the tract in the United States. Throughout the next 13 years, Uithoven contested the condemnation on various grounds, including failure to comply with the National Historic Preservation Act, the National Environmental Policy Act, the Federal Tort Claims Act, and state law. He was unsuccessful in each judicial outing, and in 1991, this court sanctioned Uithoven and his attorney and ordered Uithoven to vacate the subject property. On March 14, 1991, Uithoven was evicted.

Uithoven then filed suit in the United States District Court for the District of Columbia under 28 U.S.C. § 1361, seeking a writ of mandamus to compel the Corps of Engineers to resell the Clay County property to him. The government moved to dismiss, and when Uithoven did not file a timely response, the court dismissed the case for improper venue and on the merits, finding that Uithoven "ha[d] failed to identify any statutory or constitutional provision that satisfies the mandamus standard." The court subsequently denied Uithoven's motion to alter or amend judgment, and he appealed to the United States Court of Appeals for the District of Columbia Circuit. Upon motion of the government, the appeals court granted summary affirmance, finding that the "district court properly dismissed the complaint for improper venue." Uithoven then filed a motion to clarify judgment, which the court denied, stating that the court's order "clearly addressed only the district court's disposition of the venue issue, and not the court's resolution of the merits."

This mandamus action ensued. In it, Uithoven seeks to compel the defendant, the Secretary of the Army, "to perform a duty owed to [him]," namely "offer[ing] the property, which was condemned in 1978, for sale to Plaintiff, Felix E. Uithoven." Basing his mandamus request on the Federal Water Project Recreation Act (FWPRA), Uithoven argues that because defendant failed to secure a cost-sharing agreement with a local government for recreation development and because the land is not being used for "any lawful purpose," he must offer the land for resale to Uithoven. Under Uithoven's view,

defendant's failure to do so indicates "that the real reason for the refusal to sell the land must be that officials of the United States are angered at Plaintiff because he has filed numerous legal proceedings protesting the original condemnation and because of his resistance to the condemnation."

In response, defendant filed a motion to dismiss or, alternatively, for summary judgment. Initially, he argues that this cause is barred by res judicata based on the proceedings before the District of Columbia courts. Alternatively, he contends that the FWPRA does not apply to the Tenn–Tom but that even if it does, Uithoven is not entitled to a writ of mandamus, as defendant has a discretionary, not a mandatory, duty to reconvey the property to Uithoven since the property, which is encompassed within the Barton Ferry Recreation Area, is being used for a lawful purpose, having been scheduled for future development and presently being used on a temporary basis for wildlife mitigation.

## DISCUSSION

### I.

Although a judgment affirmed on appeal usually has conclusive effect, where "the appellate court affirms on one ground [underlying a lower court's judgment] without passing on the other, the second ground is no longer conclusively established under the collateral estoppel doctrine." 1B James Wm. Moore & Jo Desha Lucas, *Moore's Federal Practice* para. 0.416[2] (2d ed.1995). *See Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 342 (5th Cir.1982) ("[O]nce an appellate court has disposed of a case on the basis of one of several alternative issues that may have grounded a trial court's judgment, the issue decided on appeal is conclusively established for purposes of issue preclusion"); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir.1981) ("[T]he general rule is that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court"); *see also International Refugee Organization v. Republic S.S. Corp.*, 189 F.2d 858, 862 (4th Cir.1951).

After careful consideration, the court finds that the instant case falls squarely within the reach of these authorities since the appeals court reached only the improper venue issue and did not address the district court's ruling dismissing Uithoven's case on the merits. Although the district court's ruling on the merits remains intact, it simply has no res judicata effect here, and this court will therefore proceed to consider the other bases of defendant's request for dismissal.

## II.

### A.

28 U.S.C. § 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." A writ of mandamus is not available to review discretionary acts of officials, as it is "an appropriate remedy only when the plaintiff's claim is clear and certain and the duty of the officer is ministerial and so plainly prescribed as to be free from doubt." *Giddings v. Chandler,* 979 F.2d 1104, 1108 (5th Cir.1992) (internal quotations omitted). "It is hornbook law that mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases. Though it is a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion." *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir.1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

> Generally speaking, before the writ of mandamus may properly issue three elements must coexist: (1) a clear right in the plaintiff to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; (3) no other adequate remedy available. In connection with the last requirement, it is important to bear in mind that mandamus does not supersede other remedies, but rather comes into play where there is a want of such remedies. Admittedly the alternative remedy must be adequate, i.e., capable of affording full relief as to the very subject matter in question.

*Carter,* 411 F.2d at 773.

### B.

Because Uithoven contends that the Federal Water Project Recreation Act (FWPRA) controls defendant's alleged duty to reconvey the Clay County property to him, the court begins with a consideration of that Act, which opens, in pertinent part, with the following policy statement:

> It is the policy of the Congress and the intent of this part that (a) *in investigating and planning* any Federal navigation, flood control, reclamation, hydroelectric, or multiple-purpose water resource project, full consideration shall be given to the opportunities, if any, which the project affords for outdoor recreation and for fish and wildlife enhancement and that, wherever any such project can reasonably serve either or both of these purposes consistently with the provisions of this part, it shall be constructed, operated, and maintained accordingly....

16 U.S.C. § 460*l*–12 (emphasis added). To effectuate that purpose, the FWPRA requires, before any water project is authorized, a letter of intent from a non-federal public body agreeing "to administer project land and water areas for recreation or fish and wildlife enhancement or for both...and to bear not less than one-half the...costs of the [recreation] project...and to bear one-quarter of such costs allocated to fish and wildlife enhancement...." 16 U.S.C. § 460*l*–13. Even if a letter of intent is not procured before project authorization, "lands may be provided in connection with project construction to preserve the recreation and fish and wildlife enhancement potential of the project," 16 U.S.C. § 460*l*–14(b), if a cost sharing agreement is executed within ten years after initial operation of the project. 16 U.S.C. § 460*l*–14(b)(1). Of importance to Uithoven's argument is the following subsection, which addresses the situation in which a cost-sharing agreement is not procured within that time period:

> If, within ten years after initial operation of the project, there is not an executed

agreement as specified in paragraph (1) of this subsection, the head of the agency having jurisdiction over the project *may* utilize the lands for any lawful purpose within the jurisdiction of his agency, *or may* offer the land for sale to its immediate prior owner or his immediate heirs at its appraised fair market value... *or,* if a firm agreement by said owner or his immediate heirs is not executed within ninety days of the date of the offer, *may* transfer custody of the lands to another Federal agency... *or may* lease the lands to a non-Federal public body, *or may* transfer the lands to the Administrator of General Services for disposition [as surplus property]. In no case shall the lands be used or made available for use for any purpose in conflict with the purposes for which the project was constructed....

16 U.S.C. § 460*l*–14(b)(2) (emphasis added).

In support of dismissal, defendant argues that (1) the FWPRA does not apply to the Tenn–Tom and (2) even if it is applicable, defendant has discretion regarding reconveyance to the prior owner, Uithoven. In response, Uithoven insists that defendant has admitted the applicability of the FWPRA, pointing to an environmental impact statement (EIS) which states that the Corps of Engineers

> has been directed to implement a cooperative-development recreation program in consent with a legally constituted non-federal cost sharing sponsor as stated in the Federal Water Project Recreation Act.... This policy change applies to the development of all the initial recreation facilities on the [Tenn–Tom] which will not be completed by the end of December, 1982.

He also maintains that because the Clay County property is being used for wildlife mitigation rather than recreation or transportation, and because it was taken by condemnation, it is not being used for a lawful purpose and must therefore be offered for resale to Uithoven. This argument hinges on language in the Water Resources Development Act (WRDA), which provides as follows:

> [T]he Secretary [of the Army] is authorized to mitigate damages to fish and wild-

life resulting from any water resources project under his jurisdiction, whether completed, under construction, or to be constructed. Such mitigation may include the acquisition of lands ...except that—

> (A) *acquisition under this paragraph shall not be by condemnation* in the case of projects completed as of November 17, 1986....

33 U.S.C. § 2283(b) (emphasis added).

The court thus turns to defendant's first ground for dismissal, i.e., the applicability of the FWPRA, which is silent as to the projects to which it applies. Defendant points to only one case which discusses that issue in the context of projects authorized before the passage of the FWPRA. In *Sierra Club v. Froehlke,* 392 F.Supp. 130 (E.D.Mo.1975), *aff'd on other grounds,* 534 F.2d 1289 (8th Cir.1976), the plaintiff challenged the construction of the Meramec Park Reservoir on the Meramec River in Missouri. That project had been authorized by Congress as part of the Flood Control Act of 1938 with funds being appropriated in 1966 for its construction. *Sierra Club,* 392 F.Supp. at 142. Plaintiff argued that the project violated the FWPRA since the Corps of Engineers had neither requested nor received a cost-sharing agreement from the state of Missouri. *Id.* In construing the FWPRA, the district court, without explanation, held that "projects such as the Meramec Park Reservoir, which were previously authorized are clearly not covered by the [FWPRA]." *Id.* The court found further support for its conclusion in the Flood Control Act of 1966. *Id.*

Having carefully considered the matter, the court is of the opinion that there is language in the statute itself to indicate that Congress intended the FWPRA to apply only to projects authorized after 1965. *See* 16 U.S.C. 460*l*–12 ("in investigating and planning any Federal ...water resource project ..."). However, because the FWPRA is less than clear on this issue, the court turns to the legislative history of that act which, in this court's opinion, squarely answers the question. The House Report unequivocally states, "This act is applicable to all projects authorized after the date of this act, including those that may be authorized during

"1965." H.R.Rep. No. 254, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1864, 1867. The FWPRA, therefore, does not apply to the Tenn–Tom, which was authorized nineteen years earlier.

Uithoven does not dispute the validity of *Sierra Club* or the legislative history of the FWPRA. Rather, as previously stated, he argues that defendant has admitted the applicability of the act and focuses on language contained in an EIS which references the FWPRA and its cost-sharing measures. After careful consideration, the court is unpersuaded by Uithoven's argument. Defendant's decision to implement, as a matter of policy, the cost-sharing goals of the FWPRA, without the attendant time schedules, is not, in this court's opinion, an admission that the FWPRA is applicable to the Tenn–Tom. In fact, the final supplement to the EIS, dated April, 1982, anticipates the situation in which "cost sharing arrangements do not materialize" along the Tenn–Tom. In that event,

> this would represent a restricted development situation from the standpoint of providing recreational facilities.... Under the restricted development scenario project land acquired for recreation which is not developed would be available for wildlife management and timber production and could be utilized for public hunting and/or less intensive recreational activities where developed facilities are not required.

These statements differ considerably from

> the comparable provisions of the FWPRA, *see* 16 U.S.C. § 460*l*–14, and lend additional support to defendant's argument that the FWPRA is inapplicable in this case. Uithoven can find no relief in the 1974 amendments to the FWPRA affecting its cost-sharing provisions, or Congress' determination that the changes "shall apply to all projects the construction of which is not substantially completed on [March 7, 1974]," since, as the court has found, the FWPRA does not reach the Tenn–Tom.

■ Assuming arguendo that the FWPRA does control defendant's disposition of the former Uithoven property, the court is of the opinion that the act does not mandate reconveyance. Section 460*l*–14(b)(2) is phrased in the disjunctive with permissive language, thereby giving defendant discretion as to the use of the property and its disposition.

Uithoven's argument does not center on the nature of the statutory language, however, but focuses instead on the question (which he believes is factual in nature) of whether defendant is using the property for a lawful purpose. If not, according to Uithoven, defendant must afford him the opportunity to repurchase it. As previously noted, Uithoven argues that using the property for wildlife mitigation violates the Water Resources Development Act (WRDA). The court does not agree. Although the WRDA prohibits defendant from condemning property "under this paragraph" for wildlife mitigation, it does not prevent defendant from using property previously condemned via other legislation for that purpose. *See also* Pub.L. No. 99–662, § 601(a). Uithoven's assertion that defendant has allowed the property to "lie idle and has done nothing to use it for any purpose whatever" is to no avail. The affidavits and depositions of officials of the Corps of Engineers indicate (1) that the timber has been selectively cut on the property "to reduce competition and improve wildlife habitat" and (2) that "[a]llow[ing] nature to have it" in the situation "where they don't put any money in it but just allow people to go in there and enjoy nature" is a viable form of mitigation.

■ Uithoven's final argument in support of mandamus is that even if the FWPRA does not require defendant to reconvey the property, "no serious reader of the statute can doubt that [it] permits such a reconveyance" and therefore a "fact-finder could legitimately find that the reason Defendant will not agree to sell the property back to [him] is that he has initiated extensive litigation ...against the United States protesting the original condemnation." In Uithoven's eyes, defendant's refusal to do what is permitted is a violation of the First Amendment. Even if the court allows Uithoven that assumption, it is of little use, as an allegation that defendant has violated the Constitution alone is insufficient for the issuance of a writ of mandamus. *City of Milwaukee v. Saxbe*, 546 F.2d 693, 700 (7th Cir.1976). What must be focused on instead is the constitutional duty owed to Uithoven "to do the act in question." *Carter*, 411 F.2d at 773. As Uithoven has failed to

direct the court's attention towards any constitutional right to reconveyance or any duty on defendant's part to perform that act, his petition on constitutional grounds fails as well.

### CONCLUSION

Having carefully considered the evidence, the argument of counsel, and the applicable case law, the court finds that as defendant is under no constitutional or statutory duty to reconvey the Clay County property to plaintiff and plaintiff has no such right in reconveyance and as there are no genuine issues of material fact, defendant is entitled to summary dismissal of this action.

An appropriate final judgment shall issue.

### *FINAL JUDGMENT*

Pursuant to an opinion issued contemporaneously herewith, it is ORDERED:

That defendant's motion to dismiss or, in the alternative, for summary judgment is well taken and is granted;

That this cause is hereby dismissed with prejudice.

SO ORDERED.